Call the case 18-23.3. Global LLC I'm sorry, that just seemed to go on and on and on Unduly prolix Step up and please identify Good morning, your honors. Kathryn Weiler on behalf of Northwest Community Hospital, also known as NCH if that makes the panel's job a little easier Good morning, your honors. Mitchell Chabin of Levin Ginsberg on behalf of Appalachia Cross Appalachian ESP Global For brevity's sake, I'll refer to my client as ESP Alright, well you know the 15-15 and whatever after that But if we ask a lot of questions, we'll give you more time So relax and do your job Question for clarification, if that's okay Sure This obviously involves an appeal and a cross appeal Right Do your honors want counsel to address both the appeal and the cross appeal within the initial 15 minutes? Sure Okay, thank you for the clarification I'll try to Okay, thanks Thank you, your honor I can't tell if the comment about the potential for many questions is a threat or an encouragement, but either way Good morning, your honors. May it please the court, my name is Kathryn Weiler As I said, I represent NCH in this appeal At this time, I ask the court reserve approximately five minutes for my rebuttal Today we ask that the circuit court's judgment be reversed There are three reasons First, there existed no oral contract in this case between NCH and ESP The plain language of the party's unambiguous agreement, to which I will be referring as LOA-1 I hope that's not too cumbersome when we say LOA, we mean letter of agreement So LOA-1 is the indication of that contract We're into acronyms Excellent, not everyone is into acronyms I try to avoid them in this situation, they seem appropriate LOA-1 defined the scope of the services that NCH hired ESP to complete It's in the contract, that's the scope of the party's agreement There is no oral contract beside that And that included conducting an RFP And the written contract further specified that the agreement What do you mean it involved conducting an RFP? I'm looking at that agreement under section 5, additional services And it specifically does not include an RFP That's what they might do You want them to do it for pro bono apparently Incorrect, Justice Where specifically in there does it say it? I read the whole, I could not find anything that said specifically There's references but nothing in the contract The NCH's understanding of the meaning of the contract And the scope of work is in the appropriately titled scope of work And that is included within LOA-1 as Exhibit A So Exhibit A clarifies, here's the scope of work for this specific contract That we will be undertaking for you And within Exhibit A, I could walk the Court through every paragraph I'm sure the Court would prefer that I not Is Paragraph 8, Paragraph 8 is Section 5 specifically excludes and is excessive And only counts if you agree to greater terms And a breakdown of money Which is referred to later by the former person who left the company That's incorrect, Your Honor And let me explain Section 5, the additional services section to which the Court is referring Identifies a number of services which the parties may or may not agree to And this is included in the contract Separate and apart from the scope of work That's what becomes crucial here The language of the additional services paragraph states Clients may choose to do a variety of additional To contract for a variety of additional services And examples, quote, examples of the additional services may include Yeah, but here the hospital wanted stuff done And they did the stuff for the hospital And then the hospital's like, well, we don't have to pay anything? That's incorrect, Your Honor And this is why this becomes a state You're saying that with a straight face I am saying that with a straight face Because that is the understanding of the hospital Here is why This paragraph, paragraph 5, or excuse me, Section, Section 5 Is very equivocal, it states may repeatedly There is a reason for that And the reason is because you look at the scope of work What exactly is the scope of work for which the parties contracted? And in the scope of work, it states, paragraph 8 Create service acquisition strategy Quote, separate equipment into strategic groupings For the purpose of creating a competitive market-driven auction That's the first thing that ESP That's correct, and that is the first thing that ESP I agree, I agree, I agree, Your Honor, I agree That's the first thing that ESP did in this case There is another sentence after that Identify qualified supplier participants per equipment category, comma And conduct line item bid process A line item bid process is an RFP It is identifying who will participate in that auction And conduct the auction, conduct a line item bid process It is in this paragraph I completely agree with you, Your Honor That the first sentence that identifies a competitive market-driven auction Talks about creating one That's not an RFP That's the creation of the concept We put together the paperwork We compile all of the necessary information For the purpose of creating a market-driven auction Absolutely agree The second sentence is what changes the equation That's what the circuit court did not discuss That, however, is crucial to NCH's understanding Of exactly what the scope of work agreed to in this written agreement entailed Identify qualified supplier participants And conduct line item bid process So the hospital gets all this work and all this savings 400 grand from Sodexo, etc. For $10,000 The $400,000 capital contribution that is discussed in this case Is a capital contribution that the evidence established Was on the table before any of the written agreements Or conversations began with ESP Who negotiated it? Who negotiated the Sodexo, the capital contribution? Right This comes back to the court's question about All of this for $10,000 And I am trying to answer the court's question Just bear with me That's fine I don't want it to seem like I'm hiding You can harass me I'm used to it from you, Your Honor I don't doubt it The scope of what the hospital was intending to do Writ large Was to outsource all of their equipment maintenance services At the time before the contract was entered into For the last several years There's testimony in the record on this There had been an effort by the hospital And there existed a working group To try to identify cost-saving strategies These things sound completely normal We hear about them every single day I'm sure the court has these My law firm has these committees This is how the process works That had been going on for several years And the hospital was at a point And again, this is in the record The hospital was at a point Where they had agreed Okay, all of this large-scale equipment These are the large machines The MRI machines, radiology, whatnot Should be brought under a single umbrella Instead of just handled by each department And this working group had already on the table Proposals from two different vendors GE and Sodexo Sodexo is the company that ultimately NCH elected to contract with Those proposals were on the table in part Because there were working relationships Between the hospital and those suppliers And actually NCH had recently In terms of immediately before Their agreement with ESP in 2014 They had recently outsourced Another substantial contract To Sodexo that had to do with nutrition I think Sodexo was providing For example, meal services For patients in the hospital And for the hospital cafeteria So there was a working relationship already With Sodexo There had already been a solicitation For a proposal from Sodexo For equipment maintenance outsourcing And Sodexo had indicated If you go ahead with us On an equipment maintenance contract We will make this $400,000 capital contribution All of that happened Before there was ever any introduction To anyone affiliated with ESP in this case And that's important for two reasons One, Your Honor It answers your question about The $400,000 capital contribution That was already on the table And it was on the table Because of this working group That had already interacted with Sodexo On exactly this question Two, though It has to do with your question, Justice Lavenabout $10,000 to do nothing The $10,000 that was paid to NCH Wasn't paid to give them an answer Of whether or not they should do an RFP They knew the answer to that They had been doing that They had a working group That already had proposals on the table What NCH understood And this is what Mr. Harkey and Ms. Liu testified to What they understood ESP could do Is organize the process of an RFP And potentially, depending on ESP's relationships In that space Negotiate a better deal for them That was the whole point They didn't need to spend $10,000 To have someone come in and tell them You know, you really should do an RFP They were doing that This was not a long-term project either This was intended to be completed This concept of outsourcing equipment maintenance NCH expected that there would be a contract in place By the end of their fiscal year Which ended September 30 So they needed a contract signed by that date When were the emails from Jack Higgins to Liu In October of 2014 Confirming there was a contract And should be a payment of 10% on anything And then the subsequent email from Harkey to Higgins Confirming the agreement So there are actually two different time periods I think that Your Honor is inquiring about The first, the Harkey email Was back in July So Mr. Higgins Who comes in as an interim director of supply Which is not the large equipment machines It's all the small equipment used in the hospital Supplies, mandates Things you use in the operating room and whatnot Mr. Higgins had a previous relationship With Mr. Higgins Or indicated that he had some sort of knowledge of ESP Mr. Vintzer, who is the president of ESP They may have had a personal relationship It may just have been I know about the company What have you Either way Mr. Higgins suggested to Ms. Liu Hey, I think these guys can come in and help Professionalize this process Make it move faster I know there's a working group There are emails of record that indicate the working group Was about to make a final decision on To whom to award this contract And Mr. Higgins came in and said I think I can get you some additional savings At that point There were a few conversations that began One This is in approximately June of 2014 Ms. Liu, who is the former CEO of the hospital Decides to sign LOA-1 Yes, we agree This makes sense To professionalize this process And move it forward quickly This is where paragraph A becomes crucial As Ms. Liu testified I understood from the scope of work to this contract That we were agreeing that ESP was going to do an RFP As part of that process Mr. Higgins Excuse me, Mr. Vincer, who is ESP's president Came to the hospital and began doing Exactly what paragraph A states Separate equipment into strategic groupings For the purpose of creating a competitive market-driven auction Mr. Vincer was on site at the hospital Compiling a list of hospital equipment And it is around that time That Mr. Vincer and Mr. Higgins Had these two conversations That are described in the testimony With Ms. Liu and Mr. Hartke That, Justice Smith, is what you were inquiring about What about these emails? The email from Mr. Hartke to Mr. Higgins Had to do with that initial meeting Which was, I believe, very early July And that was when Mr. Vincer was on site At the hospital And there was a conversation That's testified to in the record Between Mr. Hartke, Mr. Higgins, and Mr. Vincer Mr. Hartke testified I understood that conversation to basically be an introduction He's on site, Mr. Vincer To do this separation of equipment into strategic groupings I.e. compile a list of what equipment we have And then we would be moving forward with the RFP And the email is entirely consistent with that understanding Yes, please move forward with the RFP We need to get this done The second email you were inquiring about, Justice Smith Is actually quite a bit later And you have to keep in mind That this was quite a compressed timeline So as this process is moving forward You have July where they're compiling this list of equipment And then you move immediately into an RFP With the goal of finalizing the decision by the end of September So it's moving quite rapidly In the middle of this, Mr. Higgins leaves the hospital He's no longer affiliated with the hospital And by the time you get to this October email Between Ms. Liu and Mr. Higgins It's prompted by an email from D.D. Lewis Who is an employee of ESP Who very late in late September After the hospital had elected to move forward With a contract with Sodexo for equipment maintenance But before the contract was signed Ms. Lewis had emailed Ms. Liu And referenced something about I think that is an email that references staying sticky Which is supposed to mean ESP will continue to be involved Will continue to offer support services Making sure that the Sodexo contract is complied with And we're saving you money And doing all of these amazing things Several of which are identified In the additional services contract provision in LOA1 And she references that ESP Ms. Lewis references that ESP has been promised Payment of 10% of all savings Over the course of the life of this new five year contract Ms. Liu testified I don't know what Ms. Lewis is talking about in this email So she emails Mr. Higgins Initially actually I think there's a phone call And then later there's an email Asking Mr. Higgins Do you know anything about this? Mr. Higgins testified Yeah I said that that's what we would do When we agreed to an RFP Ms. Liu says I don't know anything about this agreement There can't be an oral contract We can't put that through in the system There's no physical way to do it We can't even process a payment in that situation We understood from the language of paragraph 8 Of the scope of work of LOA1 That ESP was going to do an RFP And after that anything else they wanted to negotiate with us We could talk to them about But frankly we weren't interested in those additional services That was her understanding I'm a little confused So what you're arguing is that Even though RFP does not appear anywhere in the scope of work That that actually is what governed this ROP Not the letter of agreement That the justices were talking about That does specifically describe an RFP So what governs I'm sorry your honor I don't mean to interrupt Go on I mean is that your argument? No my argument and explanation is When you read LOA1 The scope of work which is attached as Exhibit A to LOA1 That's what defines the parties agreement And paragraph 8 identifies We will proceed with a line item bid process You would agree however that the letters RFP Do not appear anywhere in this Exhibit A Yes they do Yes I do agree with that Absolutely that's correct Unless we're talking about that additional services paragraph Or excuse me section 5 And again section 5 simply highlights Permissive things We may if we decide to contract for these things We may move forward with these That brings that very long factual recitation I apologize for that Brings us back to the legal issues that The circuit court erroneously decided Number one This written contract LOA1 Is what governs the relationship between the parties And when you read LOA1 It's unambiguous Paragraph 8 of the scope of work identifies A line item bid process Which is this auction that ESB conducted And The contract LOA1 Includes A provision in paragraph 12 That identifies that this is the entire agreement of the parties That means that this is the entire agreement of the parties And there can be no additional oral agreement Adding services that are Potentially referenced in this contract in LOA1 Additional services that they may or may not undertake They can't be without A written agreement that amends The parties contract That did not happen here Because that did not happen here There can be no finding of an oral contract The circuit court misunderstood That straightforward proposition of law Decided that there was an oral contract After disregarding this written contract And that was an error Even if this court were to look at these provisions And say You know, as you just pointed out, Justice Coghlan You know, the paragraph 8 in the scope of work Does not use the words or letters RFP It simply says conduct a line item bid process Could there be an ambiguity there? I don't think that there is But to the extent the court were to find that The manifest weight of the evidence that was presented During the trial Suggests quite clearly That NCH understood this is what the contract meant There was no meeting of the minds For some additional services Outside of that provision of work Conduct a line item bid process And as I mentioned, Justice Lavin, there wouldn't be Because there was no need for someone to come in And consult and tell NCH That they should go through the process of an RFP They already knew that That's what they thought they were getting here And there is no testimony in the record That disputes that Without any evidence to the contrary There can be no oral contract An oral contract at law Excuse me, an oral contract in fact Which is what the circuit court found here Functions in the same way as a written contract There needs to be an offer, acceptance, consideration A meeting of the minds There was no meeting of the minds here The testimony makes that clear And without a meeting of the minds There can be no oral contract Even separate and apart from the trial court's Determinations about the existence of an oral contract Even beyond that, the trial court further erred In analyzing damages in this case When the trial court looked at damages here The trial court considered the documents That the parties agreed Should be, were admissible here There was no statement by the parties That all of these documents should be taken at face value That the documents should be interpreted Exclusively based on the language of the documents For that true LOA2 An unsigned agreement between the two parties Which would be dispositive of the fact That there is no contract here Nonetheless, the circuit court in this case Looked at Exhibit 81 Which identified cost and savings projections Now this document in relation to Exhibit 79 These walked through A number of calculations that were made Based on the initial work That Mr. Vintzer did While on site at ESP And again, when you look back at Paragraph 8 Of the scope of work This was the whole separate equipment Into strategic groupings For the purpose of creating A competitive market-driven auction This is the analysis that Mr. Vintzer Was undergoing to establish Okay, what is NCH's annual spend On equipment maintenance And he came up with that number for 2014 This document, Exhibit 81 Tries to use that number And calculate all savings Over the course of the Sodexo contract Using that We stipulated that it was admissible So this is like a semi-stipulation It's a stipulation that this document is admissible It's not a stipulation that the calculations In the document are correct The parties had every opportunity And certainly did at length At trial Argue about whether or not These calculations were correct Now I realize this gets a little bit confusing But the reason I want to highlight This for the court Is the number that Mr. Vintzer testified about Is what everyone was identifying as the baseline The baseline is the total spend That NCH The total amount NCH was spending Each For the year 2014 On its equipment maintenance costs And Justice Lavin That number The parties did agree to that number And they said that On the record We don't dispute that That's the number that Mr. Vintzer calculated ESP agrees But then when Sodexo made a contract proposal What Mr. Vintzer did In calculating his damages in the circuit court Is he took This document Which was prepared based on Sodexo's contract proposal And he took Sodexo's invoices Their actual invoices Over the first roughly three years of the contract Which were produced in discovery And he tried to subtract The total amount of the invoices From this baseline number Saying This baseline number would be your total equipment spend For 2014 2015 2016 2017 As if it were a static number And then do a mathematical calculation Subtracting the invoice numbers The problem is There is nothing in the record That establishes That that baseline number Would have remained static And on the contrary I believe Now if this is inaccurate I apologize to the court But I believe there is testimony of record There is certainly argument That that number absolutely can change Depending on what happens to equipment You know What if a piece of A large piece of equipment Starts on fire Is replaced Is changed out If a warranty is extended There are myriad variables Involved in the calculation of that number And there is no testimony About what that number properly would have been For 2016 and 2017 To calculate damages There was a lot of discussion about this in the circuit court Because Mr. Vintzer wanted to offer that testimony But Mr. Vintzer was not identified as an expert witness And that certainly is information That would not be within the knowledge Or understanding of a lay witness I don't know any of that information I would suggest that perhaps the court doesn't either You don't have that kind of expertise So the circuit court properly decided That Mr. Vintzer would not be allowed to testify About what the baseline properly would be In 2016 and 2017 The problem then Is without that information There is not anything in the record That fixes what the appropriate damages would be In this case there is nothing but speculation Based on this original baseline And that is where the circuit court's error Comes into play in calculating the damages Instead of accepting that the only year For which Mr. Vintzer was allowed to testify About damages was 2015 The first year of the contract And that testimony stands And it's undisputed The circuit court stated that It felt it had some sort of an obligation To try and figure out what damages should be here And proceeded to make that calculation Based on information in Exhibit 81 And that was an error The circuit court has no obligation to do that That burden is on the plaintiff The plaintiff here did not satisfy that burden And because they could not satisfy that burden They are not entitled to those damages That is why if this court finds That there was appropriately a finding of an oral contract In this case At a minimum this case should be remanded For a calculation of damages Based only on the evidence of record Which speaks only to 2015 For purposes of a calculation of damages Unless the court has further questions I'll reserve the remaining time I have Though it may be for rebuttal Thank you Thank you, Your Honor May it please the Court Good morning, Your Honors Again, Mitchell Chabin On behalf of the Apolee Cross-Apollon ESP Global, LLC May I reserve five minutes for rebuttal? Okay Your Honors, on behalf of ESP As the Apolee We are asking this Court To affirm the trial court On the issues raised by Northwest Or NCH On appeal On behalf of ESP As the Cross-Apollon We are asking this Court To reverse the trial court Relative to the trial court's calculation Of ESP's damages And ask this Court to remand the case Back to the trial court To calculate ESP's damages Consistent with the party's agreement Which is ESP's fee should be Ten percent of the actual savings Realized by NCH Under the Sodexo contract That calculation that we're asking the Court to make Is in Exhibit Trial Exhibit 91 Which Your Honors can find At In ESP's opening brief As Exhibit SA14 And that sets forth the calculation We believe is the correct calculation of damages So First I'll turn to the issues raised by The appellant Northwest To begin with there was some discussion By Northwest Council Regarding the Court's finding of an implied contract An implied in fact contract The Court's finding in that regard Is supported by the manifest weight of the evidence We agree with Northwest Council That the LOA that was signed Executed, performed by the parties Is not ambiguous As the trial court concluded The RFP Was explicitly excluded From the initial assessment And just to take a step back About what Northwest Is getting for $10,000 in that initial assessment The evidence in the record shows That when Jack Higgins was hired on To replace the last director of supply chain He found that the Northwest's biomedical equipment Were handled on a department by department basis So cardiology was handling its own equipment maintenance needs Radiology was handling its own equipment needs, etc. Higgins testified that there were some efforts internally To try to consolidate the equipment maintenance needs Of the hospital Because it was recognized that that would be a way to Potentially save money But there was no person who had a central responsibility For organizing all that information So each of the department heads were engaged in their own efforts To try to consolidate the equipment maintenance So just to jump ahead Counsel's representation That there was an offer on the table from Sodexo To pay the hospital $400,000 If they consolidated equipment maintenance With Sodexo Is simply not true and not supported by the evidence There had been discussions about potentially consolidating Equipment maintenance with Sodexo But it wasn't on a hospital-wide basis It was on a department basis And there was no discussion of $400,000 in the record Prior to ESP becoming involved So setting that aside The agreement as the court correctly found Is not ambiguous Specifically provides that the RFP Is not included in the initial assessment It noted that Jack Higgins Again, who worked for the hospital Not for ESP Testified that the actual request for proposal That gets sent out to the industry vendors Was not part of the initial assessment There's extensive testimony about After the initial assessment is complete And what is the hospital getting in the initial assessment ESP is essentially inventorying The entire universe of Northwest biomedical equipment These are hundreds of pieces of equipment On a line-by-line basis What they are, how old the equipment is Where the equipment is on their existing warranty A lot of this biomedical equipment Needs to be serviced on a regular basis So a lot of the pieces of equipment are already under service contracts Which may be expiring or won't be expiring For another year or two All of that has to be charted out and scheduled in a way So that if the hospital wants to move forward with Phase 2 ESP has the wherewithal to package up that information In a way where the industry vendors Can bid on the project To know what they're bidding on And it's an enormous amount of work to figure out all that information And so it's undisputed that ESP did that In a condensed period of time Then the testimony is, following the completion of Phase 1 Vinter, who's the president of ESP Higgins, who's the point person on behalf of the hospital Dealing with ESP And Marsha Liu, the hospital CFO And Mike Hartke, the COO Had a discussion about whether to move forward with the additional services The additional service would be actually bringing the RFP to market Conducting a reverse auction by having industry vendors Bid on the work And then working with ESP, working with Northwest To select the best bidder Negotiating that contract and then seeing it through Through execution and performance It's also, the court correctly found That during these discussions Vinter and the representatives of Northwest Discussed how the hospital could pay for these services The LOA, which was signed and performed Refers to a few different methods Of paying ESP for the additional services One possible method is a flat fee Another possible method is to roll in ESP's fee Into the RFP so it's essentially Paid for by the vendors Another option is for the hospital to pay ESP Based on a percentage of the savings that the hospital realizes As a result of the contract that they enter With the winning bidder The evidence at trial showed that the hospital Selected the payment option involving Paying a percentage of the savings realized Under the winning bidder's contract Over the life of that contract And the court also found that it was Undisputed that that agreement was to be 10% of the savings realized as a result Of the winning bidder's contract So there was an offer to perform The additional services There was ESP's acceptance of performing those additional services For a fee based on 10% of the savings the hospital Would realize There's no dispute that ESP Sent out the RFP to I believe six or eight Different industry vendors ESP conducted three separate rounds of auctions Engaged in the contract negotiations Entered into a binding long-term agreement At the request of Northwest ESP went back to the industry players To try to get a better deal Suggesting to them that they offer a cash incentive Payment in order to win the contract That is where the $400,000 cash incentive payment Came from because Peter Went to the final bidders Who made it through the first two rounds And said to put this over the finish line You're going to need to sweeten the deal And the uncontested testimony is in the final round of auctions And the Sodexo came to that auction with a poster-sized check For $400,000 payable to the hospital And that's what sealed the deal And the reason they did that is because Peter Asked them to sweeten the deal To sweeten the offer in order to solidify them Winning the contract and that's exactly what happened And that is what the court found And the manifest weight of the evidence supports that finding The counsel's argument That the integration clause In the letter of agreement in the LOA Precluded any oral contract for additional services The trial court addressed that argument And found that the Oral contract for the additional services Was not a modification Or amendment to the LOA The LOA specifically provides that the parties Could and would negotiate terms For the additional services that were Outside, specifically outside the scope of the LOA So the integration clause in the LOA Does not in any way preclude the court From finding that the parties entered into a separate agreement For the performance of the additional services For a fee equal to 10% of the savings realized By Northwest with the new vendor Counsel's argument That the trial court's calculation of ESP's damages Based on Exhibit 81 Is too speculative Is incorrect Now this is where our cross appeal comes into play So one thing we want to make clear to the court Is Exhibit 81 was prepared Following the third round of the auctions Where Northwest was considering Entering into a contract with Sodexo To consolidate its equipment maintenance costs Prior to entering that contract Northwest requested ESP and Sodexo To project how much savings Northwest could anticipate realizing If they went through with the Sodexo contract And the result of that request is Exhibit 81 Which you can find in the ESP's opening brief At Exhibit SA13 And Exhibit 81 Is a rational way to calculate A reasonable way to calculate ESP's fee In the absence of any other evidence To calculate the fee But just putting that aside for a second As Northwest counsel represented The baseline in Exhibit 81 Represents the actual amount of money That Northwest spent on equipment maintenance For biomedical equipment in 2014 That's the last full year Before they entered into the Sodexo contract So the issue arises that When the parties agree That they're going to pay ESP a fee Equal to 10% of the savings The question is the savings compared to what And the answer to that question As demonstrated by the evidence In the record Is that it's the amount of money ESP, I'm sorry, the amount of money Northwest is paying for equipment maintenance Under the Sodexo contract Compared to what Northwest was paying for equipment maintenance Before the Sodexo contract So that baseline The 2014 baseline is a precise and exact number That's undisputed So on a go-forward basis In order to calculate ESP's savings We would always compare what they were spending Under the Sodexo contract against what they were spending Before the Sodexo contract So that baseline wouldn't change And in Exhibit 81 Which was provided by ESP and Sodexo Prior to Northwest entering the Sodexo contract The savings is illustrated By showing the amount that the hospital Is expected to pay to Sodexo Over the five-year term of the contract Against what they were paying in 2014 Before they entered that contract And based upon those representations Northwest entered the contract With Sodexo So Exhibit 81 sets forth what the expectations Of the parties are That the savings would be measured by comparing What the hospital was paying under the Sodexo contract Compared to what the hospital was paying Before the Sodexo contract Now there was some testimony at trial About whether the hospital's equipment maintenance costs Would have stayed the same after 2014 And Vincer's testimony was It probably wouldn't have stayed the same If they didn't enter the Sodexo contract It likely would have gone up One, because the equipment is getting older And equipment maintenance costs don't go down As your equipment ages And two, there's just the general increase In the cost of things year over year for inflation Vincer also testified that ESP would have been justified In including an inflationary factor Into the baseline So that it increased each year Based on some random inflationary factor That we would apply But he said ESP didn't do that Because it wasn't the party's agreement And again, if there were any ambiguity about that Exhibit 81 in the column I'm sorry, in the row That describes the raw savings There's in parens it says No inflation factor And that inures to the benefit of the hospital Not to ESP Because if we apply an inflationary factor to their baseline Their baseline goes up Their costs that they're paying Sodexo stays the same So the savings is even more But again, Vincer said we didn't do that Because we didn't agree to do it It's just not what we did And that's what we reflected in our projection to Northwest In order to show them what they could expect to save And that's how we're calculating our fee Because that's what we represented to them We would do And so we are asking this court To set aside the trial court's calculation of damages And instead use the baseline Which, again, is consistent with the party's agreement That we're going to pay a 10 percent of the savings Against what we were spending Before we entered the Sodexo contract And instead of calculating ESP's fee Based upon the projected amounts That the hospital was going to pay to Sodexo Which is reflected in exhibit 81 We ask that the court use the actual amounts That Northwest paid to Sodexo Under the contract Because we tallied up all the invoices And then subtract those from the baseline To determine what the actual savings is And that calculation is set forth in exhibit 91 Which is essay 14 in ESP's opening brief And this court can get to that calculation Three different ways One, the court can find that despite the trial court's ruling There is ample evidence in the record That the parties agreed That the savings would be calculated Based on comparing it to the 2014 baseline Because that's the only number we know with certainty If we try to figure out the 2015 baseline We have to apply some random Inflationary amount and make some assumptions About what would have happened to NCH's Equipment maintenance costs if they weren't with Sodexo Rather than do that We're sticking with the baseline as we represented In the document we gave to Northwest Before they entered the contract And that's a fair question, Your Honor And what came out was It was incredibly important to And it's not just your side, it's both sides Well, it was incredibly important to Northwest That this process be completed before the end of Northwest's Fiscal year so they could include The projected savings in their budgets for the following year So ESP did what would normally take About three or four months In the initial assessment And condense it down to about six weeks And then in the phase two, take what would normally Take about six months and condense it into two months So they were working so fast And had all of their manpower dedicated to this project To meet their client's expectations That no one got around to signing the second contract That's how it happened So one way the court can adopt The calculation that the cross-opponent is suggesting Is by simply finding that there's ample evidence in the record That this is what the parties agreed to And we did, we point to Exhibit 81 Which was the inducement for Northwest To enter the Sodexo contract And there the savings is calculated Using the 2014 baseline consistently along the length of the contract And again, that's to the benefit of Northwest Whereas changing the baseline would work to its detriment For the reasons we discussed The second way the court can get to this calculation that we're suggesting Is by finding that the trial court was wrong In determining that Peter Bincer's testimony Regarding the use of the baseline Was expert testimony that was not disclosed In the 2013 disclosures And The trial court concluded That Bincer couldn't rely on his years of experience To support his methodology For calculating the damages But the fact is that there was no Reference to industry standards In terms of how to calculate the fee Bincer testified that this is just This is how we do it This is what we represented to Northwest Before they entered into the Sodexo contract That we would measure the savings based upon what you were spending now Before you entered the contract Not to try to figure out what you might have spent next year After you've entered the contract So there's nothing expert about that It's just the way the business owner calculates the fee He charges to his customers And there's nothing special about the calculation It's basic arithmetic We're taking the amounts that Northwest paid to Sodexo And we're subtracting the amounts that they paid before the Sodexo contract Which is the baseline And we're taking that difference and multiplying it by 10% And that is ESP's fee There's no specialized knowledge There's no expert testimony needed So if this court rejects the trial court's finding That Bincer's testimony about the baseline was expert testimony Then you can get to the calculation that we're suggesting Even if the court finds that Bincer's testimony is expert testimony Even if the court doesn't find that the parties agreed to use the baseline As the basis for calculating the savings  The court can still use the baseline As the basis for calculating the savings And we can still come to the same conclusion that we're asking for Because we agree that Absent evidence in the record Of the actual amounts The hospital paid Sodexo under the contract It would be reasonable for the court To use Exhibit 81 to calculate the damages Because one, it's the basis of the parties' expectations Two, there's a lot of testimony About what went into creating Exhibit 81 And that it would be a very, very close estimate As to what would actually play out When the parties performed the contract That's all fine, except the court ignored Well, I'll point it back up So in calculating the damages based on Exhibit 81 The trial court implicitly agreed That carrying the baseline Year after year to measure the savings Was a reasonable way to do that And once you accept that it's reasonable to carry the baseline Year after year, our position is Rather than use the amounts that Northwest is projected to spend under the Sodexo contract As illustrated in Exhibit 81 Rather than use that, let's go to Exhibit 91 Which summarizes the amounts that Northwest is projected to spend Under the Sodexo contract And then subtract out what they were paying Before the Sodexo contract To get to the actual savings realized And we're supposed to do all that, not remand it back to the trial court Because when you started, you said remand it back to the trial court To make the calculation. Which is it? Why, if it's within your authority to do it here I think it's very simple math If you adopt the Exhibit 1 As being reflective of the party's agreement Then Or you could remand it back to the trial court To redo the calculation based on your instructions I know there are like six different prayers for relief I'm just trying to figure out which one you're referring to Well, so we And in that calculation, we are asking for the court To include the $400,000 incentive payment Now, you'll recall Northwest was very critical to them To complete this process before the end of their fiscal year They wanted to see some benefit on their books Now And that $400,000 that Peter Vintzer convinced Sodexo To put on the table Was very attractive to Northwest Because that money would come in now And would be reflected in this year's books So that was a win that ESP got for the hospital And should rightfully be included In the amount of equipment maintenance cost savings That the hospital realized So for those reasons We ask that this court Deny Northwest's issues on appeal Reverse the trial court's calculation of damages And adopt the calculation Proposed by ESP Which reflects the actual amount That Northwest saved under the Sodexo contract And the actual fee That ESP earned pursuant to the parties agreement And thank you Thank you I promise I will keep my rebuttal short I'd like to start Justice Kotlin with your question How did you even get into this position How do you not have a written contract In this type of situation For this amount of money Over this period of time And that's exactly how NCH feels about this case And I think it's the question NCH's witnesses at trial talked about this They talked about how Of course a contract like this would always be in writing And actually Mr. Vintzer conceded That typically a contract like this would be in writing Ms. Liu and Mr. Vintzer talked about how NCH doesn't even have a way to process payment On an invoice in this type of situation Without a written contract The hospital cannot enter into an oral contract of this size For this kind of reason I'm guessing there's a contract out there somewhere For all those services that you alluded to Or actually discussed in your opening comments There's an LOA-1 in this case Was the contract that NCH understood it had entered into If the court's referring to I'm talking about your agreements with Sodexo And all these things that you say were in place The $400,000 that you were going to get back From Sodexo, yes, that was a contract that was heavily reviewed And negotiated by Wendy Rubis who was NCH's counsel And by Mr. Hertke, the COO at the time Absolutely. And that is why NCH In the testimony demonstrates this was gobsmacked by this claim Because this was not their understanding They thought everything was in a written agreement And they wouldn't have ever conceded that there existed some sort of Oral agreement floating around in the ether Because they didn't have the ability to do that So I agree with the court But that's inconsistent with the testimony It's inconsistent with Mr. Vintzer's testimony Mr. Vintzer who claims that this is this large-scale agreement That was agreed to by the parties It is absolutely consistent with the understanding of NCH Which comes back to this idea of no meeting of the minds If the court even has to get to the point of evaluating Whether there is an oral contract in this case As counsel just conceded the parties Now I realize the parties interpret LOA-1 differently But neither party thinks that document is ambiguous Both sides think it clearly lays out Exactly what the scope of work to be performed was in this case And as NCH has said And as you've heard me say with nauseating repetition today That included an RFP And furthermore, this is where LOA-2 Becomes important to the court's analysis It's exactly the point that you were raising, Your Honor Because there was a submission of a proposed written contract That would have formally identified all of this agreement It's in the proposed LOA-2 And NCH reviewed that document And said, you know what, we're not interested These aren't the services that we want you to provide us with The only other point that I'd like to address Is this issue related to the baseline First of all, just to be clear And there was certainly no suggestion of this by Mr. Chabin But just to be clear, Exhibit 91 was actually a demonstrative exhibit That was submitted late in the trial There was no stipulation on that document Everything Mr. Chabin said about its contents is accurate But I just don't want there to be any confusion regarding the stipulation on that But in terms of the actual baseline Of course the baseline would change The baseline is a number from a snapshot in time in 2014 When there was an analysis of here's the hospital's spend on equipment maintenance That necessarily is going to change over time You can't just use that one number And calculate anticipated damages Or your estimated savings over the life of a five-year contract That's what the trial court decided And the trial court made that decision correctly The problem with the trial court's ruling is that instead of then finding There's nothing else to support a way to make this calculation The trial court reached and tried to find a way to make a calculation And as you suggested, Your Honor, how are you supposed to make that calculation? It's not in the record You can't make that calculation now. It's too late Finally, as to the $400,000 It is certainly not undisputed in the record That that $400,000 resulted from Mr. Vintzer's negotiating On the contrary, there is testimony from Ms. Liu There is testimony from Mr. Hartke And there is evidence in the record that establishes That that $400,000 discussion had already happened Before ESP entered the picture There are no further questions We ask that the court reverse to vacate the judgment in favor of ESP Or alternatively to vacate for purposes of a damages calculation As I've described it Thank you Good afternoon, again I'll be very brief I just want to address two points First is regarding the changing baseline Again, when the court found That there was an agreement  10% of the savings That they had made In the case of the Sodexo contract The question arises The savings compared to what? So ESP Prepared along with Sodexo Exhibit 81 Which illustrated to Northwest Before they entered into the Sodexo contract That the savings would be calculated By comparing what What Northwest was spending under the Sodexo contract Compared to what they were spending before the Sodexo contract Theoretically If Northwest had not entered the Sodexo contract In 2014 In 2015 Northwest's equipment maintenance costs Likely would have changed in some way But accounting for that change Would require making some assumptions And projections Which again would inure to the benefit of ESP And not to Northwest Because as the undisputed testimony of Mr. Vintzer was If their maintenance costs in 2015 Were definitely not going to go down At best they would stay the same And more likely they would increase As the equipment gets older And the maintenance costs for the older equipment goes up And just because of inflation And again he testified ESP could have justifiably increased the baseline By some inflationary factor But they didn't do it Because that's not what they agreed to And that's not what they represented to Northwest When they showed them the projection Of their anticipated cost savings Which induced Northwest to enter the Sodexo agreement So by calculating it Using the baseline year after year They're effectuating the party's agreement And the party's expectations And they're not applying any kind of speculative Inflationary percentage to increase the baseline We're sticking with the one thing we know for sure To the penny Which is what the hospital is spending before the contract Versus the other thing we know to the penny Which is what the hospital is spending under the Sodexo contract Lastly I wanted to address the issue of the $400,000 There is nothing in the record That suggests the $400,000 was on the table Before ESP was involved The evidence shows that ESP was amongst I think the three final bidders Going into the third round It was at Northwest's suggestion to Peter Vintzer To go back to the bidders And see if you can get them to sweeten the deal If the $400,000 had been on the table Before ESP got involved It would have already been on the table Before round three of the auction And it wasn't And that's undisputed So for those reasons the evidence That the trial shows That it was Peter Vintzer and ESP That negotiated that $400,000 incentive payment And it would be rightful to include that In the calculation of Northwest's savings Under the Sodexo contract and ESP's fee And if your honors have no other questions Thank you very much for your time You both were very well prepared I don't think I could argue this case I enjoyed how precise you were I appreciate it Thank you